## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| GILBERT ANTHONY MARTINEZ, TDCJ #1247069, | § § § | |
| Petitioner, | § § | |
| v. | § § | CIVIL ACTION NO. H-09-0736 |
| RICK THALER, Director, Texas Department of Criminal Justice - Correctional Institutions Division, | § § § § | |
| Respondent.[1] | § § | |

# MEMORANDUM AND ORDER

The petitioner, Gilbert Anthony Martinez (TDCJ #1247069), is incarcerated in the Texas Department of Criminal Justice - Correctional Institutions Division ("TDCJ"). Martinez, who is represented by counsel, seeks a writ of habeas corpus to challenge his state-court murder conviction under 28 U.S.C. § 2254. The respondent has moved for summary judgment, (Docket Entry No. 6), and Martinez has filed a reply, (Docket Entry No. 10). Based on the pleadings, the state-court records, and the applicable law, this court grants the respondent's motion for summary judgment and dismisses this case. Final judgment is entered by separate order. The reasons for this ruling are set forth below.

---

[1] The petition names Nathaniel Quarterman as the respondent. Because Quarterman has retired from his position as Director of the TDCJ-ID, his replacement, Rick Thaler, is substituted as the proper respondent under Rule 25(d) of the Federal Rules of Civil Procedure.

## I.     Background

A Harris County, Texas grand jury returned an indictment against Martinez in 2002, charging him with murder.  The indictment alleged that Martinez  intentionally and knowingly caused the death of his 17-year-old girlfriend, April Dykes, by shooting her with a deadly weapon — a firearm — or by otherwise causing her death by committing an act clearly dangerous to human life.  The indictment included an enhancement paragraph alleging that Martinez had a felony conviction, for assault on a public servant.

At trial, the prosecution presented evidence that Martinez took Dykes to a local park and shot her three times in the chest and back after he found her talking to another man.  Two former girlfriends testified that Martinez had admitted killing Dykes and that he did not appear remorseful.  Police officers obtained a warrant to arrest Martinez, who was living with his grandparents.  When the officers tried to execute that warrant, Martinez fled.  The jury in the 338th District Court of Harris County, Texas found Martinez guilty as charged.

During the punishment phase of the trial, the prosecution presented evidence that as a juvenile, Martinez had committed numerous offenses that resulted in adjudications of delinquent conduct,[2] and that he had a prior felony conviction for assaulting a police officer.  The prosecution also presented testimony from a gang task-force officer that Martinez was a member of a violent El

---

[2]  In Texas, a juvenile engages in "delinquent conduct" if he violates a penal law that is "punishable by imprisonment or by confinement in jail, violates a court order, or engages in conduct related to driving under the influence of alcohol.  *See* TEX. FAMILY CODE § 51.03.  An order or adjudication that a juvenile has engaged in delinquent conduct is not a criminal conviction.  *See* TEX. FAMILY CODE § 51.13(a).  Subject to certain restrictions, however, juvenile adjudications of delinquency are admissible during the punishment phase of a subsequent criminal trial for a felony offense.  *See* TEX. CODE CRIM. PROC. art. 37.07, § 3(a); *see also* GEORGE E. DIX AND ROBERT O. DAWSON, 43 TEXAS PRACTICE SERIES, CRIMINAL PRACTICE AND PROCEDURE § 38.54 (discussing the admissibility of juvenile adjudications in later criminal prosecutions).

Salvadoran street gang known as the "Mara Salvatrucha" or "MS-13."[3] Martinez's grandfather testified as a prosecution witness that his grandson had punched him in the face during an altercation. Additional evidence showed that Martinez had engaged in combative behavior as a pretrial detainee at the Harris County Jail, and that he had received a disciplinary conviction for assaulting another inmate.

Martinez became disruptive during the punishment phase of the trial. More than once, the trial court halted the proceedings and excused the jury from the courtroom to admonish Martinez for his behavior. The record indicates that Martinez was angry about the guilty verdict returned at the end of the liability phase and that he was frustrated at the testimony presented by the prosecution. Martinez argued loudly with his attorney about the prosecution's punishment evidence, particularly the evidence that he had committed criminal offenses as a juvenile. Martinez repeatedly refused to obey the trial court's instructions to sit quietly and was finally removed to a holding area. After hearing the punishment evidence, the jury found that the enhancement allegation was true and sentenced Martinez to life imprisonment.

On direct appeal, Martinez argued that the trial court had abused its discretion by admitting certain evidence. The intermediate court of appeals included in its opinion a detailed summary of the facts presented at trial. The summary included the following:

> On the night of November 2, 2000, [Martinez]'s girlfriend, the complainant April Dykes, was found shot to death in Idlywood Park in Houston. Earlier that evening, April had gone to visit a neighbor, Albert Castillo. April and Castillo went to the corner store in Castillo's car. Later, while they sat in the car and talked, [Martinez]

---

[3] Among other things, the prosecution presented photographs showing that Martinez had numerous tattoos of gang-related symbols, consistent with testimony about his MS-13 gang membership.

drove by, turned around, then parked near Castillo's car. [Martinez] drove a black Cadillac with a white right-front panel.

[Martinez] got out and approached the passenger side of Castillo's car. April ducked down in her seat to hide. [Martinez] saw April and told her to get out of Castillo's car while cursing at her. April hesitated, telling Castillo that she did not want to get out. Castillo told her to stay in the car, but April replied, "That's my boyfriend, I got to go." April got into [Martinez]'s Cadillac with [Martinez], Terrence "TJ" Brundage, and Alex Caballero, and the group headed toward Idylwood Park.

Shortly thereafter, Darryl Hickey and Sabrina Sheppard heard three gunshots from their respective homes near Idylwood Park. Hickey ran outside and saw three men running out of the park and getting into a dark-colored, older-model, four-door car with a light-colored front panel on the passenger side. Sheppard ran to the end of her driveway and saw a dark-colored vehicle with a white right-front panel at the park. She then saw three men run out of the park and get into the car. Hickey and Sheppard ran to the park and found April gasping for breath. Moments later, April died. Houston Police Sergeant Michael Peters arrived at the scene, "bagged" April's hands, and requested fingernail scrapings from the medical examiner.

The next day, Sergeant Peters received a report from Crime Stoppers that the shooter had been identified as "Gilbert Martinez." Sergeant Peters located [Martinez] and asked him to come in and give a statement. In his statement, [Martinez] asserted that he was not with April at the time of the incident and did not know the circumstances surrounding her death.

April's autopsy revealed that she had been shot three times in the chest, once at close range. Among the samples submitted for DNA analysis were scrapings from under her fingernails. The analysis indicated that [Martinez] could not be excluded as a possible contributor to the material recovered from April's fingernails.

In January 2001, [Martinez] told his ex-girlfriend Monica Parra that April was killed in his car during a drive-by shooting. When Parra continued to question him as to why there were no bullet holes in his car, [Martinez] admitted that he killed April.

> In November 2001, [Martinez] began dating Maya Blakely.  Blakely
> asked [Martinez] multiple times about April's death over the course
> of several months.  [Martinez] first asserted that she was killed by a
> jealous boyfriend.  Eventually, [Martinez] confessed that he shot
> April, and he took Blakely to Idylwood Park to show her where it
> occurred.  Blakely contacted police, and [Martinez] was arrested.

*Martinez v. State*, 186 S.W.3d 59, 61-62 (Tex. App. — Houston [1st Dist] 2005).  The intermediate

court of appeals affirmed Martinez's conviction and the Texas Court of Criminal Appeals refused

Martinez's petition for discretionary review.

Martinez filed an application for a state writ of habeas corpus under Article 11.07 of the

Texas Code of Criminal Procedure.  In that application, Martinez argued that he was entitled to relief

because: (1) he was denied effective assistance of counsel; and (2) he was denied due process when

two of the prosecution's witnesses violated "the rule."  The state habeas trial court entered findings

of fact concluding that Martinez was not entitled to relief.  The Texas Court of Criminal Appeals

agreed and denied relief, without a written order, based on the state habeas corpus court's findings.

*See Ex parte Martinez*, No. 71,324-01 (Tex. Crim. App. March 11, 2009).

Martinez now seeks a writ of habeas corpus in federal court to challenge his state murder

conviction under 28 U.S.C. § 2254.  His federal petition is filed by the same attorney who

represented Martinez on state habeas review.  Martinez argues that he is entitled to relief because

he was denied effective assistance of counsel at his trial.  Martinez complains that his trial attorney:

(1) "failed to properly investigate his mental health" or request a competency evaluation after he

disrupted the punishment phase of the trial; and (2) as a result of this failure to investigate Martinez's

mental state, his trial attorney "failed to present any mitigating evidence" during the punishment

phase to explain Martinez's apparent psychological difficulties.

In the summary judgment motion, the respondent notes that Martinez's ineffective-assistance claims were rejected by the state courts on habeas review. The state habeas court found that Martinez's outbursts during the punishment phase of his trial showed that he was reacting to the evidence he heard, not that he was incompetent to continue the trial. The state court concluded that defense counsel was not deficient for failing to investigate Martinez's mental state. The respondent maintains that Martinez fails to show that he is entitled to relief from the state court's decision under the governing federal habeas corpus statutes and that his claims fail as a matter of law. The parties' contentions are addressed below under the federal habeas corpus standard of review.

## II.     The Applicable Standard of Review

Federal habeas corpus proceedings filed after April 24, 1996 are governed by provisions of the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), codified at 28 U.S.C. § 2254(d). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA was enacted in part to ensure federal-court deference to state-court determinations by limiting the scope of collateral review and raising the standard for federal habeas relief. *See Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (citations omitted). As the Supreme Court has explained, the federal habeas corpus statutes amended by the AEDPA set a "highly deferential standard for evaluating state-court rulings . . . which demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal citation omitted). The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (quotation omitted).

For claims adjudicated on the merits, the AEDPA standard provides that a petitioner is not entitled to relief unless he shows that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 404-08 (2000); *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir. 2009). A state court unreasonably applies clearly established precedent if it identifies the correct governing legal principle but unreasonably applies that principle to the facts of the case. *Brown v. Payton*, 544 U.S. 133, 141 (2005). Under this standard, an unreasonable application is more than merely incorrect or erroneous; rather, the state court's application of clearly established law must be "objectively unreasonable." *Williams*, 529 U.S. at 409. The objective-reasonableness inquiry focuses on the state court's ultimate decision, not on whether the state court "discussed every angle of the evidence." *Dale v. Quarterman*, 553 F.3d 876, 879 (5th Cir. 2008) (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc)). The deferential AEDPA standard of review applies even when a state court fails to cite applicable Supreme Court precedent or fails to explain its decision, *see Early v. Packer*, 537 U.S. 3, 7 (2002), and when the state court denies relief without a written opinion, *see Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003). In such a situation, a reviewing court: (1) assumes that the state court applied the proper "clearly established Federal law"; and (2) then determines whether its decision was "contrary to" or "an objectively unreasonable application of" that law. *Id.* (citing *Catalan v. Cockrell*, 315 F.3d 491, 493 & n.3 (5th Cir. 2002)).

A state court's findings and conclusions are entitled to deference unless the petitioner shows that they are "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2); *Buntion v. Quarterman*, 524 F.3d 664, 670 (5th Cir. 2008). A state court's findings of fact are presumed to be correct on federal habeas review, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption extends not only to express findings of fact but also to the implicit findings of the state court. *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citations omitted).

## III.     The Ineffective Assistance of Counsel Claims

Martinez maintains that, after the jury returned its guilty verdict, he became incompetent to continue with the punishment portion of the proceeding. Martinez contends that after he began engaging in disruptive behavior in court, his counsel should have inquired into his mental health and requested a psychological evaluation to determine his continued competency. Martinez presents a related argument that his defense counsel was deficient for failing to present "mitigating evidence to explain the vast problems [Martinez] had exhibited" during the punishment phase. Martinez contends that he is entitled to relief under 28 U.S.C. § 2254(d) because he was denied effective assistance of counsel in the punishment phase.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel at trial. U.S. CONST. amend. VI; *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). The right to counsel guaranteed by the Sixth Amendment includes "the right to the *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) (emphasis added). Claims for ineffective assistance of counsel are analyzed under *Strickland v. Washington*,

466 U.S. 668 (1984).   To prevail under *Strickland*, a defendant must demonstrate both constitutionally deficient performance by counsel and actual prejudice as a result of the alleged deficiency. *See Williams v. Taylor*, 529 U.S. 390, 390-91 (2000).  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that rendered the result unreliable." *Strickland*, 466 U.S. at 687.

### A.    The State Court Proceedings

The offense occurred in November 2000.  Martinez was arrested in September 2002, and detained in the Harris County Jail until his trial began on June 15, 2004.  The guilty verdict was returned on June 21, and the punishment phase ended on June 22.

The record shows that Martinez was frustrated with the guilty verdict and believed that his juvenile convictions should not have been admitted in the punishment phase.  But there is no basis to conclude that his counsel was deficient in failing to inquire into whether Martinez was suffering from a mental impairment or had developed a problem understanding the nature of the proceedings against him.

At the start of the punishment phase, Martinez and the court had the following exchange about his plea to the enhancement allegation, which stemmed from a felony conviction when Martinez was 17:

| | |
|---|---|
| THE COURT: | Mr. Martinez, would you stand please. |
| MS. SIEGLER: | Cause No. 988055.  Before the commission of the offense alleged above, on April 5, 1999, in Cause No. 98-07421J Amended, in the 313th District Court of Harris County, Texas, the defendant was convicted of the felony of assault on a public servant.  Against the peace and dignity of the State.  Signed by the foreman of the grand jury. |

| THE COURT: | To which the defendant responds? To which the defendant responds? |
|---|---|
| MR. HALE: | Your Honor, at this time my client is not entering a response. I'll enter a response of not true for him. |
| THE COURT: | Thank you very much, Mr. Hale. . . . |

*Court Reporter's Record*, July 21, 2004, at 5.

During the punishment phase, Martinez objected to the prosecutor's stated intent to introduce evidence about the enhancement conviction. Martinez's remarks demonstrate, however, that he understood the evidence against him. Martinez's remarks show that he believed that because the enhancement offense was part of his juvenile record it was inadmissible during the punishment phase.[4] The following exchange occurred after the trial court excused the jury from the courtroom:

| THE COURT: | I'm going to have to retire you for just a moment. |
|---|---|
| | (Jury leaves courtroom) |
| [MARTINEZ]: | — that's what I'm saying. You're not supposed to — you can't bring that up, man. That's in juvenile. I'm a grown man . . . I'm an innocent man. They're not hearing my side of the story. They can't convict me on hearsay. That's — |
| THE COURT: | . . . Please be seated. Mr. Martinez — |
| [MARTINEZ]: | Yes, ma'am. |
| THE COURT: | — it is very important to me and everyone involved in this trial that you have a fair trial. I am not going to permit you to prejudice yourself. You have now disrupted this courtroom and this is another contempt. |

---

[4] Martinez's date of birth is listed as June 16, 1982. Martinez was 18 years old in November of 2000, when April Dykes was killed. Martinez was 17 when he was convicted of assaulting a peace officer, which is the felony offense that was used to enhance the indictment for purposes of punishment. Martinez was 21 at the start of his trial on June 15, 2004.

[MARTINEZ]:        May I speak, ma'am?

THE COURT:        No, you may not.  And you are going to be quiet or you are going to be taken out of the courtroom where you cannot hear or see the witnesses.  I am not going to permit this jury to be disrupted in this way.  You will sit down.  You will be quiet.  Sit down.

*Court Reporter's Record*, June 21, 2004, at 6-7.  After the jury returned, Martinez calmed down.

Martinez interrupted again when of the prosecution witnesses testified about another offense that

Martinez committed as a juvenile.  Outside the jury's presence, the trial court directed the deputy to

remove Martinez from the courtroom and described his behavior for the record:

THE COURT:        . . . Members of the jury, I'm going to have to ask you to step outside for a few minutes.

(Jury leaves courtroom)

THE COURT:        Mr. Martinez.

[MARTINEZ]:        Yes, ma'am?

THE COURT:        You are now going to be taken out of the courtroom. Deputy Briones, would you remove him, please?

THE BAILIFF:        Yes, ma'am.

THE COURT:        When you decide that you can behave, you let law enforcement — when you decide —

[MARTINEZ]:        — ma'am.  That's all I'm trying to say.

THE COURT:        Okay.  We can have the jury back.

MR. HALE:        Judge, for the record, on behalf of my client, I'm going to have to object to that.

THE COURT:        Certainly.  Certainly.  I have been unable to get him under control, Mr. Hale.  I've tried it since a couple of minutes after 9:00 [a.m.] and it's now 9:17 by the courtroom clock and he has been steadily disruptive, has refused to follow my orders, was waving his arm, was

|  | tapping on the table, actually drumming on the table, and talking so loudly that it was interrupting the testimony and I believe — I know that I warned him at least four times before the fifth time. I had him removed from the courtroom. Okay. |
|---|---|
| MR. HALE: | Just for purposes of the record — and I'm not disputing any of the record, Judge. I think that's a fairly accurate rendition of what [has] been going on. But for the record, Judge, my objection is overruled? |
| THE COURT: | Yes, your objection is overruled. When your client decides that he can behave himself, then he can return to the courtroom. But he'll have to be prepared to apologize to the witness. Okay. We're ready [for the jury to return]. |

*Court Reporter's Record*, June 21, 2004, at 13-14. Martinez returned to the courtroom later and apologized to the trial court for "speaking too loudly to his lawyer" during the proceedings. *Id.* at 38. Outside the jury's presence, Martinez explained that he had been trying to consult with his attorney about the punishment evidence:

| [MARTINEZ]: | I mean, I just want to say — I'm saying that, you know, that's ten years ago that I did all that, ma'am, you know. I mean, the D.A. is not supposed to bring up any cases as a juvenile. That's sealed by law. . . . I'm saying — by Texas law. That's what I'm trying to tell my lawyer. |
|---|---|
| THE COURT: | You have one of the best lawyers in Texas representing you. |
| [MARTINEZ]: | Yes, ma'am. I understand but I'm saying that the D.A. ain't supposed to bring up any cases that I done as a child. I'm an adult, ma'am. |
| THE COURT: | Are you ready to sit down and be quiet? |
| [MARTINEZ]: | Yes, ma'am. |
| THE COURT: | Because any further outbursts from you puts you back in the holdover. Do you understand me? |
| [MARTINEZ]: | Yes, ma'am. |
| THE COURT: | There will be no further outbursts. Not now. Not later. None. |

| [MARTINEZ]: | Is it possible I could talk to my lawyer alone? |
| MR. HALE: | If I may have a moment to speak with him briefly, your Honor? |
| THE COURT: | Very briefly. |

*Court Reporter's Record*, July 21, 2004, at 38-39.

Martinez interrupted again after his grandfather testified about a 2001 argument during which Martinez punched his grandfather in the face. *See id.* at 55-56. While the jury was out on its mid-morning break, the trial court warned Martinez again to stop drumming his fingers on the table and speaking loudly to his lawyer. *See id.* at 71. Martinez interrupted again when the prosecution was presenting testimony about a disciplinary case that Martinez had received at the Harris County Jail for fighting with another inmate:

| [MARTINEZ]: | — this man, he's an inmate.  He's a worker, man.  Like these workers, man.  You know what I'm saying.  How's he going to come down and present a case and say — I got assaulted.  I got in a fight. |
| THE COURT: | Deputy, would you please escort Mr. Martinez to the waiting room? |
| [MARTINEZ]: | Come on.  What's up?  I get in fights with blacks and whites and Mexicans.  Come on. |

*Court Reporter's Record*, July 21, 2004, at 75.

After the jury retired to consider its verdict on punishment, Martinez spoke loudly, insisting that he was "innocent by Texas Criminal Law" because Maya Blakely lied during her testimony. *Court Reporter's Record*, June 22, 2004, at 44. Martinez argued that because he did not have a felony conviction on his "adult record," he was eligible for probation and that the prosecutor had "just violated [his] rights by bringing [in] stuff from when [he] was a juvenile." *Id.*

Martinez remained quiet when the jury returned and announced its punishment verdict. Once the verdict was announced, however, Martinez began arguing that he was "innocent," that his attorney had not represented him properly, and that the jury had not heard his side of the story. *Id.* at 46-48. Based on this record, habeas counsel argues that Martinez was obviously "psychotic," that his counsel was deficient for failing to question Laura Gomez further about her nephew's mental state, and that defense counsel should have filed a motion for a competency evaluation. This court's own review of the trial transcript, however, does not demonstrate that Martinez was laboring under a mental impairment or that he was unable to understand the nature of the proceedings against him. Contrary to habeas counsel's assertions, the record of Martinez's courtroom outbursts shows that he understood the proceedings very well but that he was angry about the evidence and the result of the trial.

In his state habeas application, Martinez argued that his defense attorney should have been on notice that his mental state had deteriorated on June 21, when his aunt, Laura Gomez, commented during her testimony that she did not believe that Martinez was "mentally all there any more." Martinez also pointed to his outbursts in open court as evidence that by the punishment phase of the trial, he had become incompetent to proceed. In his state habeas proceedings, Martinez argued that his attorney should have filed a motion for a competency evaluation. Martinez noted that he had been evaluated by a psychologist at the Texas Youth Commission ("TYC") in 1997, when he was 14 years old.

Martinez's trial attorney, Jeff Hale, filed an affidavit with the state habeas corpus court in response to the ineffective assistance allegations. *Ex parte Martinez*, No. 71,324-01 at 131-34. Hale explained why he did not file a motion on Martinez's competency to stand trial and did not request

14

funds to hire an investigator or mental health expert to evaluate his client. Hale had met with Martinez "numerous times" before the trial and did not observe anything in Martinez's speech, actions, or demeanor that caused any concern about his competency. *Id.* at 131. Martinez "was able to discuss the facts of his case lucidly" and "expressed an understanding" about the evidence that would be brought against him. *Id.* Hale noted that Martinez "would express anger and frustration at the charges," but that his emotions were not "remarkable" under the circumstances. *Id.* Martinez's family members did not disclose any "specific information regarding possible mental health issues." *Id.* at 132. Instead, Martinez's family indicated only that he was "always hard to control" and that "[h]e had a really bad temper sometimes." *Id.*

Hale added that during his pretrial investigation, he learned that Martinez was seen by a psychologist "as a matter of routine" following his arrest as a juvenile, but that there had been "nothing significant" in the psychologist's evaluation. *Id.* Hale acknowledged that Martinez "act[ed] out in court" during the brief punishment part of the trial, but emphasized that there was no indication of any issue about his mental health. *Id.* at 133. Even during the punishment phase, Hale observed that when Martinez behaved in a disruptive manner, "he appeared to calm down quickly and would express only his frustration with the way the trial was going." *Id.* at 134. Hale concluded that Martinez "understood how the process was unfolding, he just didn't like the way the trial was proceeding." *Id.*

After considering the official trial record, the state habeas corpus court found that the facts asserted in Hale's affidavit were "true" and rejected Martinez's claim that his defense counsel's performance was deficient. The state habeas court stated as follows:

Hale never received any information from [Martinez] or his family which would indicate to Hale that [Martinez] had previous or present mental health issues.

Hale did not file a motion for competency evaluation or a motion requesting funds for an investigator or mental health expert because (a) Hale never observed anything in [Martinez's] speech, actions, or demeanor which could cause Hale concern that [Martinez] might be legally incompetent to stand trial and (b) [Martinez] sufficiently communicated with Hale, had a clear understanding of the evidence and legal proceedings, and was able to assist Hale in preparing a defense.

Since Hale was never made aware of any information reflecting that [Martinez] had prior mental health issues, then Hale did not present any mitigating evidence related to [Martinez's] prior mental health history during the punishment phase of the trial.

The documentary evidence upon which [Martinez] presently relies reflects that he was in special education classes and was cognitively and intellectually functioning in the Borderline Range of intelligence but does not establish that [Martinez] had psychological or mental problems which could lead to a finding of legal incompetence.

[Martinez's] behavior during trial resulted from his apparent understanding of evidentiary matters in the legal proceedings as well as frustration with the manner in which the trial progressed.

[Martinez] was legally competent to stand trial.

[Martinez] fails to show that Hale acted deficiently by failing to request a competency hearing or to request funds for an investigator or mental health expert.

*Ex parte Martinez*, No. 71,324-01 at 450, ¶¶ 7-13. Based on these findings, the state habeas court

concluded that "the totality of the representation afforded [Martinez] was sufficient to protect his

right to reasonably effective assistance of counsel in trial." *Id.* at ¶ 14. The Texas Court of Criminal

Appeals denied relief, without a written order, after adopting the state habeas corpus court's findings

and conclusions.

The state court correctly identified the governing *Strickland* standard and properly applied it to Martinez's ineffective-assistance claim.   Because Martinez repeats the same ineffective-assistance claim on federal habeas corpus review, the central question is not whether this court "'believes the state court's determination' under the *Strickland* standard 'was incorrect but whether the determination was unreasonable — a substantially higher standard.'" *Knowles v. Mirzayance*, — U.S. —, 129 S. Ct. 1411, 1420 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007)). And "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 129 S. Ct. at 1420. For the reasons set out below, Martinez's claim fails under this "doubly deferential" standard. *Id.*

## B.     The Allegations of Deficient Performance

A defense counsel's performance is constitutionally deficient if it falls below an objective standard of reasonableness, as measured by prevailing professional norms. *See Strickland*, 466 U.S. at 687-88 (explaining that the petitioner must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixty Amendment"). In evaluating an allegation of deficient performance, a reviewing court must make every effort "'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Id.* at 689 (quotation omitted). "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*   That is, a habeas petitioner must overcome the presumption that, under the circumstances, "the challenged action might be considered sound trial strategy." *Riley v. Dretke*, 362 F.3d 302, 305 (5th Cir. 2004).   A federal habeas corpus court may not find ineffective assistance of

counsel merely because it disagrees with counsel's chosen strategy. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999). It is well established that "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997); *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983) (citing *Fitzgerald v. Estelle*, 505 F.2d 1334 (5th Cir. 1975); *Daniels v. Maggio*, 669 F.2d 1075 (5th Cir. 1982)).

To the extent that Martinez contends that his mental state become an issue during the punishment phase of the proceeding, the alleged deficiency necessarily concerns tactical or strategic choices that arose during that portion of the trial. The issue turns on whether defense counsel was deficient for failing to request a competency evaluation after Martinez became disruptive during the punishment phase of the proceeding.

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-91. Relying on *Wiggins v. Smith*, 539 U.S. 510 (2003), Martinez contends that his defense counsel's strategy during the punishment phase of the trial was unsound because it was based on an inadequate investigation. In *Wiggins*, the Supreme Court held that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 539 U.S. at 521. In determining whether trial counsel's performance was deficient, the "'focus [is] on whether the investigation supporting counsel's decision not to introduce additional mitigating evidence of [a petitioner's] background *was itself reasonable*.'" *Gray v. Epps*, — F.3d —, 2010 WL 3259202, *3 (5th Cir. 2010) (quoting *Wiggins*, 539 U.S. at 522-23) (emphasis and alteration in original). The Fifth Circuit has recognized that a

criminal defense attorney has a duty to investigate a client's medical history when it becomes clear that the defendant is suffering from mental difficulties rendering him insane or incompetent to stand trial. *See Miller v. Dretke*, 420 F.3d 356, 364 (5th Cir. 2005) (citations omitted). When assessing the reasonableness of an attorney's investigation, a federal habeas corpus court must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. To establish that an attorney was ineffective for failure to investigate, a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial. *See Miller*, 420 F.3d at 361 (citation omitted); *Creel v. Johnson*, 162 F.3d 385, 396 (5th Cir. 1998). Martinez does not make this showing here. The record fails to demonstrate that Martinez was suffering from a mental impairment that rendered him incompetent to proceed with his trial or that his counsel had notice but failed to investigate.

The state habeas court found that defense counsel was not deficient for failing to investigate Martinez's mental state or file a motion for a competency evaluation because there was no evidence that Martinez was mentally ill or had become incompetent during the trial. In making that determination, the state habeas court found that counsel observed Martinez's demeanor before trial and had information about Martinez obtained from family members. The observations and information did not give defense counsel a reasonable basis for questioning Martinez's competency or investigating further. While the ultimate determination of whether counsel was deficient presents a legal question, whether counsel had notice of a problem is a subsidiary fact question that is entitled to the presumption of correctness found in 28 U.S.C. § 2254(e)(1). *See Moore v. Johnson*, 194 F.3d 586, 603-04 (5th Cir. 1999). Martinez does not present any evidence showing that defense counsel

had notice, before or during the guilt/innocence phase of the trial, of a "previous or present mental health issue." Absent "clear and convincing evidence" to the contrary, the state court's findings of fact on this issue are presumed correct.  28 U.S.C. § 2254(e)(1).

As evidence of a preexisting mental impairment, Martinez points to the psychological evaluation he received at the TYC in 1997.  The record supports the state court's conclusion that this evidence failed to demonstrate "psychological or mental problems which could lead to a finding of legal incompetence."  A review of the report shows that it consists of a psychological evaluation done as a "routine placement assessment" when Martinez was committed to the TYC for assault in 1997, at the age of 14.  *Ex parte Martinez*, No. 71,324-01 at 45-48.  The evaluation noted that Martinez was in "special education classes" and "in the Borderline Range of intellectual and cognitive functioning."  *Id.* at 46, 47.  The report also stated that Martinez had admitted to membership in the MS-13 gang, to engaging in frequent fights, and to having disciplinary problems at school.  The psychologist stated in the report that Martinez's behavior, which included instances of "theft, vandalism, burglaries of houses and cars, using a weapon that could cause serious physical injury to others, robbery, initiating fights, and truancy," indicated a "Conduct Disorder."  *Id.* at 48.  The psychologist also noted that Martinez had some "problems with anger control" but no evidence of a "formal thought disorder."  *Id.*  Defense counsel stated in his affidavit that he had reviewed the psychologist's evaluation but concluded that it contained "nothing significant."  *Ex parte Martinez*, No. 71,324-01 at 132.  Because the evaluation merely indicates that in 1997, Martinez had displayed signs of a conduct disorder but not of any mental illness, there is no basis to conclude that this information should have prompted counsel to investigate further.

The record also refutes Martinez's argument that his attorney erred by failing to introduce the 1997 psychological evaluation as mitigating evidence in the punishment phase. Because the psychologist's evaluation contained information about Martinez's admitted gang membership and his participation in criminal behavior, admitting the evaluation into evidence might well have done Martinez more harm than good. The Fifth Circuit has repeatedly denied claims of ineffective assistance of counsel for failure to present such "double-edged" evidence. *Martinez v. Dretke*, 404 F.3d 878, 889 (5th Cir. 2005); *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002); *Kitchens v. Johnson*, 190 F.3d 698, 701-03 (5th Cir. 1999).

Martinez also points to his outbursts in court during the punishment phase as evidence that his defense counsel should have been "on notice" that there was "something not quite right about [Martinez's] actions." But the record does not provide a basis for an inference that Martinez's outbursts in court put his lawyer on notice that he might have become incompetent during the period from when the trial began on June 15, 2004 to when the punishment phase began on June 21. The punishment phase ended on June 22. Nor did his outbursts during the brief period after the guilty verdict and before the sentence provide defense counsel with grounds to request a competency evaluation during the punishment phase. The test for measuring competency to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam); *DeVille v. Whitley*, 21 F.3d 654, 656 (5th Cir. 1994). Texas has adopted a substantially identical standard. *See* TEX. CODE

CRIM. PROC. ANN. Chapter 46B.003 (West 2006).[5] The record shows that on June 17, 2004, during the guilt/innocence phase, the trial court warned Martinez, outside the jury's presence, to stop making "signals" with his hands while the prosecution's witnesses were testifying. *Court Reporter's Record*, June 17, 2004, at 185-87. The trial court warned Martinez that he would be in contempt of court if he disobeyed the order. *See id.* Martinez stated that he understood the trial court's instruction. *See id.* at 186-87. At the end of the guilt/innocence phase of trial, Martinez became disruptive briefly when his former girlfriend, Maya Blakely, testified that Martinez had admitted that he killed Dykes because he thought she was cheating on him. *See id.* at 238. There was no indication at any point, however, that Martinez lacked a rational understanding of the proceedings or that he was unable to follow the trial court's instructions. At a hearing held outside the jury's presence at the close of the guilt/innocence phase, Martinez responded appropriately to questions from his defense counsel and the trial court about whether he wanted to testify. *Court Reporter's Record*, June 18, 2004, at 37-38. Other than the brief use of hand gestures, there is no other evidence of disruptive behavior during this phase of the trial.

The record reflects that Martinez's aunt, Laura Gomez, attempted to explain some of her nephew's behavior during her testimony as a defense witness during the punishment phase of the trial. On direct examination by defense counsel, Gomez remarked that, since his arrest and incarceration, Martinez did not seem to be "mentally all there anymore" and that he went through "phases where he just [didn't] even know what he's saying [or] doing." *Court Reporter's Record*,

---

[5] A person is incompetent to stand trial in Texas "if the person does not have: (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person." TEX. CODE CRIM. PROC. art. 46B.003(a). "A person is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence." *Id.* at 46B.003(b).

June 21, 2004, at 117-18.  Gomez added that before his arrest and incarceration, Martinez had been taking "GED classes" and had been working at a local department store.  *Id.* at 114.  She described Martinez as "a very intelligent kid" and "real smart."  *Id.* at 118.  Defense counsel made an effort to explain some of Martinez's behavior during the trial by asking Gomez about Martinez's tendency to "gesture with his hands a lot."  *Id.* at 118.  Gomez responded that Martinez had always done that. *Id.*

The record supports defense counsel's affidavit, and the state court's conclusion, that Martinez was acting out of frustration with the jury's guilty verdict and with the trial court's decision to admit evidence of his prior juvenile conviction and his jail conduct.  The record shows that Martinez's outbursts and Laura Gomez's observations about Martinez's mental state do not show that he was incompetent to continue with trial or that his counsel was deficient in failing to investigate or obtain an evaluation.[6]

Pleadings in the state court record further confirm that Martinez could and did assist with his defense.  Martinez filed more than one *pro se* motion on his own behalf prior to trial.  *Clerk's Record*, at 15-21.  Martinez also filed a *pro se* motion shortly after the judgment and sentence.  In that motion, Martinez requested his release on bond pending appeal.  *See id.* at 245-46.  Each motion

---

[6]   On state habeas review, Martinez's counsel also provided a report prepared by Dr. Dennis Slate, who interviewed Martinez on August 31, 2007, and found him to be disoriented, distracted, and disorganized in his thought processes.  *See Ex parte Martinez*, No. 71,324-01 at 119.  Dr. Slate noted that although Martinez had "no prior history of mental health treatment," his symptoms were consistent with "a psychotic disorder." *Id.*  The diagnosis made by Dr. Slate, which was based on an interview conducted several years after the trial, is not relevant because it is remote in time.  As the Fifth Circuit has observed, "[t]he proper inquiry for an incompetency claim is the petitioner's mental state *at or near the time of trial*."  *Goynes v. Dretke*, 139 F. App'x 616, 619, 2005 WL 1712276 (5th Cir. 2005) (citing *Martin v. Estelle*, 583 F.2d 1373, 1374 (5th Cir. 1978)) (emphasis in original).  Dr. Slate's report does not shed light on Martinez's competence in June 2004. At most, Dr. Slate states that "[a mental health] evaluation should have been conducted, if for no other reason, than to rule out the possibility that the defendant had deteriorated psychologically and was unable to adequately assist with his defense."  *Ex parte Martinez*, No. 71,324-01 at 121.

is neatly handwritten, cogent, and articulate. There is no sign of mental defect or deterioration. These pleadings, which appear in the state court's file, tend to refute the argument that Martinez was not "mentally all there" during his trial.[7]

A defendant is competent to stand trial if he demonstrates (1) an ability to consult with and assist his lawyers with a reasonable degree of rational understanding and (2) a rational and factual understanding of the proceedings against him. Martinez does not present evidence showing that he was unable to understand the proceedings or that he was incompetent to proceed with trial. *Moody v. Johnson*, 139 F.3d 477, 481 (5th Cir.1998). Absent a showing that Martinez was incompetent, he cannot show that his counsel was deficient for failing to investigate his mental health or request a competency evaluation during the punishment phase of the trial. *See id.* at 483; *see also Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997) ("There can be no deficiency in failing to request a competency hearing where there is no evidence of incompetency.") (quoting *McCoy v. Lynaugh*, 874 F.2d 954, 964 (5th Cir. 1989)). Because Martinez fails to show that the state court's determination on this issue was objectively unreasonable, he fails to demonstrate deficient performance on his defense counsel's part and he is not entitled to relief on this issue.

## C.   The Allegation of Prejudice

Martinez argues that he suffered actual prejudice as a result of his attorney's failure to investigate his competency or to present mitigating evidence to explain Martinez's disruptive behavior during the punishment phase of the trial. The respondent argues that, in light of the serious

---

[7] Martinez also wrote several letters to the Texas Court of Criminal Appeals during his state habeas corpus proceedings. In those letters, which dated in 2009, Martinez admits that he is "guilty of the crime," but blames other "suspects" who were present that day for failing to stop the offense. Martinez argues further that he did not deserve such a lengthy sentence.

nature of the offense, the evidence of his gang membership, and his criminal record, Martinez cannot demonstrate prejudice.

Even assuming that there was deficient performance by trial counsel, a habeas corpus petitioner must still demonstrate actual prejudice to prevail under the *Strickland* standard. Performance is prejudicial only if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* When the deficient performance occurred in the punishment phase, the relevant inquiry is whether, absent counsel's errors, there is a reasonable probability that the defendant's sentence would have been "'significantly less harsh,' *Spriggs v. Collins*, 993 F.2d 85, 88-89 (5th Cir. 1993), taking into account 'such factors as the defendant's actual sentence, the potential minimum and maximum sentences that could have been received, the placement of the actual sentence within the range of potential sentences, and any relevant mitigating or aggravating circumstances.'" *Dale v. Quarterman*, 553 F.3d 876, 880 (5th Cir. 2008) (citation and quotation omitted). When the petitioner claims that counsel failed to discover and present mitigating evidence, a federal habeas corpus court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.

Martinez was charged with murder, a first degree felony in Texas. *See* TEX. PENAL CODE § 19.02(c). A first degree felony is punishable by confinement for life or for any term of not more than 99 years or less than 5 years. *See* TEX. PENAL CODE § 12.32(a). The indictment alleged for punishment purposes that Martinez had at least one prior felony conviction, making him subject to imprisonment for life or for any term of not more than 99 years or less than 15 years. *See* TEX.

PENAL CODE § 12.44(c)(1). Martinez faced a range of life imprisonment to a minimum of 15 years. He received life.

Martinez relies on the psychological evaluation at the Texas Youth Commission in 1997, done when he was 14. As noted above, however, that evaluation from Martinez's admission to the TYC does not contain any mental illness diagnosis. The psychological evaluation describes unfavorable information, such as Martinez's admission of gang membership, a long list of criminal misconduct, and his participation in gang-related activities, including assaults and possible drug dealing. Such evidence is hardly mitigating. The prosecution presented evidence in the guilt/innocence phase showing that Martinez killed his 17-year-old girlfriend in cold blood by shooting her three times in the chest and then left her to die. The prosecution presented evidence during the punishment phase showing that Martinez had a long record of criminal offenses and that he had engaged in other violent episodes, including the assault on his grandfather and a fight with another inmate. Considering the potentially "mitigating" evidence with the evidence of the callous nature of the murder, Martinez's criminal record, and his membership in the MS-13 street gang provides no basis for inferring that the mitigating evidence would have warranted a lesser sentence. Martinez has failed to demonstrate a reasonable probability that the result of his trial would have been different and he fails to demonstrate actual prejudice.

In summary, Martinez does not show that he was denied effective assistance of counsel. He does not establish a constitutional violation. Martinez fails to demonstrate that the state court's decision to reject his ineffective-assistance claims was contrary to, or involved an unreasonable application of, the *Strickland* standard. Because Martinez has failed to demonstrate a valid claim for relief in this case, his petition must be dismissed.

## IV.    Certificate of Appealability

The AEDPA requires a certificate of appealability before an appeal may proceed. *See Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997) (noting that actions filed under either 28 U.S.C. § 2254 or § 2255 require a certificate of appealability). "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . .'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citing 28 U.S.C. § 2253(c)(1)). A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336. When the denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

A district court may deny a certificate of appealability on its own, without requiring further briefing or argument. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). For the reasons discussed above, this court concludes that reasonable jurists would not debate whether the petition should have been resolved in a different manner and the issues do not deserve encouragement to

proceed further.  Nor would jurists of reason debate whether any procedural ruling in this case was correct or whether the petitioner stated a valid claim of the denial of a constitutional right.  A certificate of appealability will not issue.

## V.     Conclusion

The respondent's motion for summary judgment is granted, the petition for a writ of habeas corpus is denied, and this case is dismissed with prejudice.  No certificate of appealability will issue.

SIGNED on September 16, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge